```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD FEDIO,                )
                              )
          Plaintiff,          )   Civil Action No. 03-1944
                              )
   v.                         )   Judge McVerry
                              )   Magistrate Judge Caiazza
EQUITABLE RESOURCES, INC.,    )
                              )
          Defendant.          )
```

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is respectfully recommended that the Defendant's Motion for Summary Judgment (Doc. 29) be granted.

### II.   REPORT

**GENERAL BACKGROUND**

The Plaintiff Richard Fedio has brought this age discrimination lawsuit against his former employer, Equitable Resources ("Equitable" or "the Defendant"). *See generally* Am. Compl. (Doc. 16). Mr. Fedio alleges that his subjection to age discrimination, in the guise of a performance evaluation and improvement program, made his employment at Equitable so intolerable he was forced to resign. *See generally id.* at ¶¶ 17-22, 27. The Plaintiff's evidence falls well short of proving constructive discharge, however, and the Defendant's Motion therefore should be granted.

**FACTS**

Mr. Fedio worked at Equitable for over 38 years, acting as Senior Project Manager in the Information Technology Department from August 2000 until his resignation effective June 2003. *See generally* Def.'s Facts (Doc. 31) at ¶ 8 (citing record evidence).[1]  In this capacity, the Plaintiff worked with a computer application known as the Customer Information System, or "CIS."  *See id.* at ¶ 9.  The CIS was a mainframe computer system that handled customer service, billing and collection matters.  *See id.* at ¶ 12.

In 2000, the Defendant's Chief Information Officer Carl Rizzo determined that the CIS was outdated and would be replaced by "READI," a computer-based system supplied by an outside company, Optiron.  *See id.* at ¶¶ 6, 13-14.  Mr. Fedio knew more about the CIS system than anyone else at Equitable, so he was made "liaison" for ushering in READI, responsible for "defin[ing] certain business processes" and "configur[ing the new system] so that the CIS functions would correctly transition over."  *See id.* at ¶¶ 19-21.

The Defendant appears to concede that, irrespective of the Plaintiff's participation, the transition went much less smoothly than expected.  *See* Def.'s Br. (Doc. 30) at 4 (READI was

---

[1]  The undersigned relies on the Defendant's statements of fact only to the extent the Plaintiff does not deny them.  *Compare generally* Def.'s Facts *with* Pl.'s Responses thereto (Doc. 39).

scheduled to "go live" by April 2001, but did not do so until February 2004) *and id.* at 5-6 (even after Mr. Fedio was removed from project, Equitable ultimately replaced its entire team "with an outside team named Widpro").  And while the record contains its share of finger pointing,[2] it suffices to say that Mr. Fedio's purported shortcomings led to his placement in a performance improvement plan ("PIP").  *See* Def.'s Facts at ¶¶ 82-83 *and* Pl.'s Dep. Tr. at 34-35 (PIP was based on Plaintiff's performance in connection with READI implementation); *cf. also* Pl.'s Dep. Tr. at 192 ("[t]he people who raised . . . objections about the [READI] project were given" unsatisfactory performance ratings, and "[t]he people who went around and said everything is working fine were given satisfactory ratings").

Equitable goes to great lengths in describing the performance evaluation system it implemented in late 1999/early 2000.  *See, e.g.*, Def.'s Facts at ¶¶ 83-100.  And though Equitable insists "[t]he performance management system was not a forced ranking system," *see* Def.'s Br. at 7, in the undersigned's

---

[2]  *Compare, e.g.*, Def.'s Facts at ¶¶ 35-36 (based on Plaintiff's performance, Mr. Rizzo "bec[a]me concerned that [Mr.] Fedio did not support replacing CIS with READI," and "was more interested in revising CIS," which he "had been involved in developing"); Pl.'s Dep. Tr. (attached as Ex. to Doc. 31) at 230 ("[i]t seems that I . . . got a reputation as being against the project," and "I had no working relationship with Optiron"); Pl.'s Decl. (Doc. 40) at ¶ 5 ("[a]fter I was removed from the project, Optiron release a major redesign . . . that addressed most of the issues I had raised," "allow[ing] most of the complexity and redundancy that I had been dealing with to be removed") *and* Pl.'s Ex. filed under Doc. 35 at pg. 19 (compensation review meeting minutes) (Plaintiff stated "he was very frustrated by the whole project," because Optiron would "never resolve identified problems," "was cutting corners and putting in a program that could not work").

view the evidence speaks for itself: "Equitable's performance evaluation system ranked employees in three categories, with the intent that approximately 20 percent would be rated as exceeding expectations, 70 percent as meeting expectations, and 10 percent as performing below expectations." *See* Def.'s Facts at ¶ 84. Those ranked in the bottom ten percent were placed in a 90-day PIP, with performance reviews conducted at approximately the 30th, 60th and 90th days. *See generally* Def.'s Facts at ¶¶ 100, 111, 117, 134, 139 (revealing operation of 90-day procedure).

Like at least two other employees on the READI project, Mr. Fedio received an unsatisfactory review, and he was placed in a PIP effective February 4, 2003. *See id.* at ¶ 111.[3] On March 19, 2003, the Plaintiff received his thirty-day review, the written portion of which concluded:

> Rich has a good working knowledge of the existing CIS system. He has completed the initial design and analysis of his assignments, as well as managed the implementation of the initial programming tasks. However, there are a few areas that continue to need improvement including thoroughness, attention to detail, project management, and communication.

---

[3] The other two employees, Pat Egan and Lisaann Mascellino, were forty and forty-one years of age, respectively, when placed in a PIP. *See id.* at ¶¶ 106, 149 (Egan); *id.* at ¶¶ 108, 150 (Mascellino). Both of these individuals successfully completed their PIPs. *See id.* at ¶¶ 107, 109.

> The number of design and programming changes that are made, as well as the number of post-implementation issues that arise, can be lessened if Rich's analysis and design process is more thorough and if more attention and thought is given to the details of implementation and testing.  While it is true that our business users tend to change or request additional items during a project, Rich's knowledge of the business and the system should allow him to proactively work with the business unit to fl[e]sh out those items sooner in the process instead of after implementation.[4]
>
> . . . .
>
> Although you have made an effort to improve your performance, the cited examples above indicate that you continue to perform below expectations overall.  [We] will meet with you again in approximately 30 days to provide you with additional performance feedback.  In the meantime, if you require clarification from [us], please ask.  Failure to improve your performance to an acceptable level will result in termination.

*See* 30-day evaluation (attached as Ex. to Doc. 31).

Two days later, on March 21st, Mr. Fedio submitted his resignation.  *See* Pl.'s email (attached as Ex. to Doc. 31) ("This is to inform you that I will be retiring effective June 1.").[5]

---

[4]  The preceding passage is quoted only to give a flavor for the substantive details in the review.  The remaining substantive comments are omitted for the sake of brevity but can be found in the record, attached to Document Number 31.

[5]  In resisting summary judgment, Mr. Fedio takes the position that his stated intent to retire was more of a "wait and see" approach.  *See* Pl.'s Decl. at ¶ 1 ("I did not retire immediately" because "I wanted to wait to see if a miracle happened and [Equitable] gave me a good review in the next 30 days").  This assertion is immaterial for the purposes of constructive discharge, however, as Mr. Fedio consistently has claimed that his work environment became intolerable as of March 2003.  *See* Am. Compl. at ¶ 27 ("[Mr.] Fedio felt compelled to submit his resignation on March 2[1], 2003 effective June 1, 2003").

**ANALYSIS**

The standards governing constructive discharge are well stated in the <u>Suders</u> decisions, first in the Court of Appeals for the Third Circuit and then in the Supreme Court.  *See* <u>Suders v. Easton</u>, 325 F.3d 432 (3d Cir. 2003) *and* <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129 (2004) (vacating Third Circuit Court's judgment on grounds not implicated below).  Most relevant here are the standards of objectiveness and intolerability:

> [A] plaintiff claiming constructive discharge must demonstrate that the alleged discrimination surpasses a threshold of 'intolerable conditions.' . . .
>
> <u>Intolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision</u>, <u>or even that the employee subjectively felt compelled to resign</u>; presumably every resignation occurs because the employee believes that it is in his interest to resign.
>
> Rather, [i]ntolerability ... is assessed by the <u>objective standard</u> of whether a <u>reasonable person in the employee's position would have felt compelled to resign</u>, -- that is, whether he would have had <u>no choice</u> but to resign.

*See* <u>Suders</u>, 325 F.3d at 444-45 (citations and some internal quotations omitted, some alterations in original, emphasis added); *see also* <u>Suders</u>, 542 U.S. at 141 ("The inquiry is objective:  Did working conditions become so intolerable that a reasonable person in the employee's position would have felt

compelled to resign?") (citation omitted).

In this case, the Plaintiff had more than "no choice" but to resign: he could have continued along with the PIP beyond the one-third portion completed before his resignation. Two other employees did just that, and they ultimately succeeded under the program. *See* discussion *supra* at n.3. And even accepting as true Mr. Fedio's stated belief that proceeding with the PIP would be futile, the Plaintiff's decision to short-circuit the process so early on was, on its face, objectively unreasonable. In light of the circumstances presented here, the objectivity and intolerability standards are set too high for the Plaintiff to survive summary judgment. *See* discussion *supra* (working conditions not intolerable even where reasonable person facing same choices would view resignation as "wisest or best decision"; reasonable person "would have [to] fe[el] compelled to resign," that there was "no choice").

Plaintiff's counsel attempts to circumvent these standards by focusing on the examples cited in Clowes as possible indicators of constructive discharge. *See* Suder, 325 F.3d at 445 (citing Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993), and listing "threat of discharge," "suggestions or encouragement of resignation," "demotion or reduction of pay or benefits," "involuntary transfer to a less desirable position," "alteration of job responsibilities," and/or

"unsatisfactory job evaluations").

Aside from his unsatisfactory job evaluation, the Plaintiff's evidence and arguments regarding the listed indicators are weak, at best. Although Mr. Fedio claims to have been promoted in 2000 and quickly demoted, *see* Pl.'s Br. at 16, these purported decisions were temporally and factually removed from the alleged constructive discharge in 2003.

As for his being removed from the READI project, Mr. Fedio complains not of being transferred to a menial or unpleasant job, but only to a position not involving "the most important computer information system project" at Equitable. *See id.* at 17-18. While the Plaintiff may now construe this as a "less desirable position," it is not the type of dissatisfaction contemplated under the law. *Cf., e.g.*, Meyer v. Brown & Root Const. Co., 661 F.2d 369, 372 (5th Cir. 1981) (cited with approval in Clowes) (finding constructive discharge where pregnant woman was transferred to warehouse, and heavier exertion level "risk[ed] harm to both herself and her unborn child"); Muller v. U.S. Steel Corp., 509 F.2d 923, 929 (10th Cir. 1975) (also cited in Clowes) (constructive discharge standards contemplate shift in responsibilities "so unattractive and unpleasant as to justify the finding that the resignation was a constructive firing")

(emphasis added), *cert. denied*, 423 U.S. 825 (1975).[6]

Counsel also points to the final sentence of the written 30-day evaluation, which stated that the Plaintiff's "[f]ailure to improve . . . performance to an acceptable level [would] result in termination." *See* discussion *supra*. This statement cannot be read in a vacuum, however. It came after Equitable's detailed suggestions for improvement, including comments revealing, (1) a clear expectation that satisfactory performance could be attained, and (2) that at least one more performance evaluation undoubtedly was anticipated. *See* discussions *supra* (noting evaluation's statements that "Rich's knowledge of the business and the system should allow him to proactively work with the business unit" and reviewers would "meet with [him] again in approximately 30 days to provide . . . additional performance feedback"). Again, the circumstances presented here are a far cry from the "threat of termination" scenarios contemplated in the law. *See, e.g.*, Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 168-69 (3d Cir. 2001) (citing case where "plaintiff was continuously subjected to racially-based insults and false

---

[6] In light of the admitted problems Mr. Fedio was having with the READI project, the undersigned questions the degree to which he actually viewed the transfer as being undesirable. *See* discussion *supra* (discussing Plaintiff's admitted "reputation as being against the [transition]" and his "frustrat[ion] with] the whole project"); *cf. also* Doc. 35 at pg. 19 (compensation review meeting minutes, revealing that Mr. Fedio was then disclaiming "READI project accountability"). In light of the parties' mutual recognition that things were not working, it appears abundantly reasonable to have allowed Mr. Fedio and Optiron to part ways. *See generally* discussions *supra*.

accusations of favoritism, wrongdoing, and incompetence; she was repeatedly admonished not to touch or steal anything; she was forced to do menial tasks not assigned to white employees; her co-workers withheld information and stole documents that she needed to perform her job; and her employer <u>threatened to get rid of her</u>") (emphasis added); *see also id.* (discussing case where general manager "boasted that the plaintiff 'would not be there long'") (citation omitted).

Even assuming reasonable minds could differ regarding the conclusions above, the Plaintiff's narrow focus on the <u>Clowes</u> indicators obscures the proper inquiry: whether Mr. Fedio's resignation was objectively and reasonably compelled under the specific facts and circumstances in this case. <u>Suders</u> makes clear that the constructive discharge inquiry "is a heavily fact-driven determination," to be "considered in light of the totality of circumstances." *See id.*, 325 F.3d at 445-46 (citations and internal quotations omitted). Having examined Mr. Fedio's claims in this context, the undersigned respectfully submits that his constructive discharge allegations are insufficient as a matter of law.[7]

---

[7] A final factor in <u>Suders</u>, the plaintiff's "explor[ation of] alternative avenues" to resignation, also favors the grant of summary judgment. *See id.* at 445 (citation and internal quotations omitted). Mr. Fedio had an obvious alternative, namely his proceeding through the PIP and making best efforts to retain his job. *Cf.* discussions *supra* (noting that two other protected employees were placed in and completed PIPs).

**CONCLUSION**

For the reasons stated above, the Defendant's Motion for Summary Judgment should be granted.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, objections to this report and recommendation are due by February 23, 2006. Responses to objections are due by March 6, 2006.


February 7, 2006

                                    Francis X. Caiazza
                                    U.S. Magistrate Judge
cc:

Michael J. Lorence, Esq.
1007 Mount Royal Boulevard
Suite 200
Pittsburgh, PA  15223

Martha Hartle Munsch, Esq.
Joseph P. McHugh, Esq.
Reed Smith
435 Sixth Avenue
Pittsburgh, PA  15219-1886

-11-